## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JANET CHAMPION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 14-206-CG-M |
| | ) | |
| | ) | |
| AUTO-OWNERS INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | | |

### MEMORANDUM OPINION AND ORDER

This matter is before the court on Defendant's motion for partial summary
judgment (Doc. 55), Plaintiff's objection to Defendant's evidence (Doc. 58), Plaintiff's
opposition to summary judgment (Doc. 59), Plaintiff's supplemental opposition (Doc.
50), and Defendant's reply (Doc. 61). For the reasons explained below, the court
finds that Defendant's motion should be granted.

### FACTS

This case involves an insurance claim for fire damage to the Plaintiff's
residence, located at 5560 Thomas Drive, Theodore, Alabama. The property was
insured by Defendant, Auto-Owners Insurance Company ("Auto-Owners"). (Doc. 55-
2). The policy of insurance provides fire coverage but excludes "action by or at the
direction of any insured committed with the intent to cause a loss." (Doc. 55-2, p.
19). The policy also included a concealment or fraud clause stating the following:

This entire policy is void if, whether before, during or after a loss, any insured has:

    a.  Intentionally concealed or misrepresented any material fact or circumstance;

    b.  Engaged in fraudulent conduct; or

    c.  Made false statements;

relating to this insurance.

(Doc. 55-2, p. 49).

Plaintiff's residence was reported to be on fire on February 25, 2010 at 0203 hours. (Doc. 55-3, p. 2). The Plaintiff, Janet Champion, and Mitchell Ferrell were reportedly asleep at the residence when the fire began and were awakened by a smoke detector and escaped through a window. (Doc. 55-3, p. 3). Firefighters forced entry through the front door. (Doc. 55-3, p. 3). The fire originated in the front den and appeared to be contained to the sofa bed. (Doc. 55-3, p. 4).

Later that same morning at 0712 hours, a second fire was reported at the residence. (Doc. 55-3, p. 5). The residence was unoccupied at the time and the front door had been nailed closed from the inside and the rear door was locked. (Doc. 55-3, p. 5). The fire was determined to be incendiary and resulted from open flame application to combustible in the middle bathroom between the commode and the lavatory. (Doc. 55-3, pp. 5, 15). The official incident report indicates that the second fire occurred between 6:30 and 7:12. (Doc. 55-4, p. 152).

At 1021 on the day of the fire, John Michael Wilson called the fire department and said he had information about the fire. (Doc. 55-3, p. 30). Mr. Wilson reported that approximately two months prior, Ferrell said he "ought to just

burn the son of a bitch." (Doc. 55-3, p. 30). Wilson reported that Ferrell said he wanted to burn the house because they were going through bad times. (Doc. 55-3, p. 42; Ex. C). About two to three weeks before the fire Ferrell came by with the Plaintiff to talk to Wilson about storing some furniture and to see if Wilson had any old furniture he could put in the house because he was going to burn it down, but Plaintiff stayed in the truck and was not part of the conversation. (Doc. 55-3, p. 43; Ex. C). Wilson reported that Ferrell came by to see him on the morning of the fire between 0630 and 0700 about renting a trailer and Ferrell stated that he had just set the house on fire again because the first fire did not do enough damage. (Doc. 55-3, pp. 30, 43, Ex. C). About 15-20 minutes later, Wilson heard the fire truck sirens. (Doc. 55-3, p. 30). Wilson recorded a later conversation with Ferrell in which Ferrell talked about starting the fires. (Doc. 55-3, pp. 44-45; Ex. C). Wilson reports that Plaintiff and Ferrell came back again to talk to him about whether he had a trailer to rent. (Doc. 55-3, p. 45; Ex. C). During that visit the Plaintiff said "let me tell you how it went down" and Ferrell stopped her saying they may have the truck bugged. (Doc. 55-3, p. 45; Ex. C). Another night the Plaintiff and Ferrell came back to see Wilson again about renting a trailer and Wilson told him if he would burn his own house, what would he do to his trailer. In response, the Plaintiff and Ferrell laughed. (Doc. 55-3, p. 45, Ex. C).

On February 25, 2010, claim representative Diana Gough met with Plaintiff and took her recorded statement. (Doc. 55-4, pp. 75-78). In the statement, Plaintiff reported that after escaping the fire, they went to the Red Roof Inn and "slept for a

hour…couple of hours…till day light, and they wouldn't let me bring my dog in and he was hollerin." (Doc. 55-4, p. 77).  After that she said they left and went to Plaintiff's daughter's house and Ferrell went to sleep on the sofa while Plaintiff and her daughter watched the news.  They saw the fire on the news and headed back to the Thomas Drive house. (Doc. 55-4, p. 77).

The Thomas Drive property is adjacent to the Bellingrath RV Park.  The Red Roof Inn is about a nine or ten minute drive from both the Thomas Drive house and Plaintiff's daughter's house. (Doc. 55-9).

Richard Ferrell was also interviewed on February 25, 2010, but by the Assistant Fire Marshal. (Doc. 55-4, pp. 158-159).  Ferrell stated that he nailed a 2x2 board across the front door after the first fire, before they went to the Red Roof Inn. Ferrell said he went out the back door and locked it prior to leaving. Ferrell said that at the Red Roof Inn they had to keep their dog in the car and he barked loudly. After a short time, around daylight, they left and drove to Plaintiff's daughter's house.  Ferrell said he fell asleep on the couch and when Plaintiff saw the report of the second fire on the news, they returned to the Thomas Drive house. (Doc. 55-4, p. 159).

On March 5, 2010, claims representative Diana Gough reported to the Auto-Owners home office that a fire inspector had called and advised that arson was suspected and that the Plaintiff's boyfriend had admitted the arson to a childhood friend. (Doc. 55-4, p. 64).

On March 12, 2010, Plaintiff was arrested on charges of arson, second degree.

(Doc. 55-4, p. 149).  During a video taped interview after being arrested (Ex. D), Plaintiff reported that the smoke detector woke them up and they went out the window.  Plaintiff called 911.  The Red Cross took them to the Red Roof Inn to stay, but there was no heat and it was cold.  Also, Plaintiff said they would not let the dog stay in the room and he was yelping in the car.  Plaintiff stated that they stayed and hour or so and then went to her daughter's house.  Plaintiff said they did not stop anywhere and that Ferrell went to sleep on the sofa in the living room and Plaintiff and her daughter watched the news.  Plaintiff stated that Ferrell was with her the whole time.  According to Plaintiff, when they saw the fire on the news Plaintiff woke Ferrell up and they went back. (Ex. D).

On March 29, 2010, a preliminary hearing was held in Mobile District Court on Plaintiff's arson charges.  The court found that probable cause existed for the charges against Plaintiff to be sent to the grand jury. (Doc. 55-4, p. 148).  On August 20, 2010, the grand jury indicted Plaintiff on two counts of arson. (Doc. 55-5).  On January 31, 2013, Richard Ferrell plead guilty to one count of arson, second degree. (Doc. 55-6).

On April 9, 2010 Auto-Owners received the cause and origin report it had commissioned by Crain & Associates. (Doc. 55-4, pp. 142-147).  The report concluded that both fires were incendiary in nature and were caused by the burning of ordinary combustibles in two separate locations. (Doc. 55-4. P. 147).

On August 3, 2010, an attorney for Auto-Owners, Judson Wells, conducted an examination under oath of Plaintiff, who appeared with her attorney. (Doc. 55-4, pp.

41-62).  During the examination the Plaintiff said Ferrell was still her boyfriend and that she did not think he had anything to do with starting the fires intentionally. (Doc. 55-4, p. 53).  Plaintiff stated that they went to the Red Roof Inn between 3:30 and 4:00 and their dog had to stay in their truck. (Doc. 55-4, pp. 53-54).  They napped off and on.  It was cold and they could not get the heat to work in the room. (Doc. 55-4, p. 56).  She called a neighbor, who told her everything looked fine and told her they were going to go to Plaintiff's daughter's house. (Doc. 55-4, p. 56).  It was about daylight, about 6:30, when they reached her daughter's house. (Doc. 55-4, p. 57).  Plaintiff confirmed that Ferrell was with her the entire time, from before the first fire through the Red Roof Inn and to her daughter's house. (Doc. 55-4, p. 57).  At her daughter's house Ferrell slept on the couch in the living room near where Plaintiff and her daughter were watching TV and Ferrell did not leave her daughter's house while she was there. (Doc. 55-4, p. 58).  Ferrell and Plaintiff had keys that would have allowed them to get back in the house through the back door. (Doc. 55-4, p. 62).

On December 17, 2010, Judson Wells' assistant prepared a memorandum of the information available pursuant to the release authorizations of Champion. (Doc. 55-4, pp. 120-128).  No records were available from the Red Roof Inn to show check-in and checkout times. (Doc. 55-4, p. 120).  On September 23, 2010, Judson Wells provided a status report that stated that the requested cell phone records had not been provided and that no action had been taken yet by the grand jury. (Doc. 55-4, pp. 134-136).  On October 22, 2010, Plaintiff provided her cell phone records to

6

Wells and they were forwarded to Auto-Owners. (Doc. 55-4, pp. 129-133). The records indicated that Plaintiff made a 911 call the morning of the fires at 2:02 a.m. and then made calls at 5:09, 5:28, 6:04, 6:52, 6:54, 6:57, 7:25 and 7:30. (Doc. 55-4, p. 133).

On December 28, 2010, an Auto-Owners Claim Supervisor sent an email advising that she thought they had enough to deny the claim at this time, but that she would probably suggest just waiting for the criminal hearing to take place in six weeks to build a stronger case. (Doc. 55-7, p. 3).  On February 15, 2011, Judson Wells reported that the Equifax records show that the Plaintiff "has lived on the financial edge for the last few years." (Doc. 55-7, p. 4).  On March 4, 2011, Wells met with an Assistant District Attorney about the case and received from him a copies of photographs and DVDs containing recorded interviews and wiretaps of Ferrell and interviews with the Plaintiff. (Doc. 55-4, p. 156).  On April 17, 2011, Wells provided the claims representative, Diana Gough, with a detailed analysis of Plaintiff's claim and concluded that based on the overwhelming evidence, it was his recommendation that the claim be denied for arson. (Doc. 55-4, pp. 65-71).  On April 12, 2011, Auto-Owners Home Office Claims advised Gough that it was "OK to deny claim as recommended." (Doc. 55-4, p. 119).  On October 11, 2011, Gough sent Wells a draft of a denial letter for his review, saying that she wanted to go ahead and send it out. (Doc. 55-4, p. 39).  Wells responded the next day with comments. (Doc. 55-4, p. 38). Gough sent another draft to Wells on November 1, 2011. (Doc. 55-4, pp. 33-35). That same day, Wells responded with comments. (Doc. 55-4, pp. 36-37).

On January 31, 2012, Ferrell plead guilty to Arson 2nd. (Doc. 55-6).  Judson Wells reported to Auto-Owners that Ferrell had plead but that the Plaintiff refused to plead to attempted Arson 3rd and her trial was continued to August 21, 2012. (Doc. 55-4, p. 31).  On August 21, 2012, Plaintiff again refused to change her plea, even though she was offered a misdemeanor count of false reporting to law enforcement.  Plaintiff's trial was continued to January 29, 2013. (Doc. 55-4, p. 26).

By letter dated October 2, 2012, Auto-Owners denied Plaintiff's fire loss claim. (Doc. 55-4, pp. 20-23).  The letter quoted language from the policy that excluded coverage for "[a]n action by or at the direction of any insured committed with the intent to cause a loss" and included the following:

> The cause of the fire determined by the fire inspector was arson. Your policy specifically excludes damages to property that were intentionally caused. Due to the facts uncovered during our investigation and after careful consideration, there is no coverage for you claim, due to concealment or fraud.

(Doc. 55-4, p. 22).

On January 29, 2013, Plaintiff's criminal trial was continued until September 23, 2013. (Doc. 55-4, p. 18).  On September 23, 2013, the criminal arson charges against Plaintiff were nolle prossed. (Doc. 55-4, p. 14).  Plaintiff's attorney inquired about the insurance claim and Wells responded that Auto-Owners was firm in its denial of the claims. (Doc. 55-4, pp. 12-13).  On March 14, 2014, counsel for Plaintiff wrote Wells, stating that the charges against Plaintiff had been nolle prossed and that Plaintiff had passed a polygraph test and requesting that Auto-Owners reconsider its denial.  (Doc. 55-4, p. 4).  Wells advised that his opinions had not

changed and that since Auto-Owners planned to call him as a witness he

recommended the case be sent to Auto-Owners' trial counsel. (Doc. 55-4, p. 9).


### DISCUSSION

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall

be granted: "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  The trial court's

function is not "to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 249 (1986).   "The mere existence of some evidence to support the

non-moving party is not sufficient for denial of summary judgment; there must be

'sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting

Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." Anderson, at 249-250.

(internal citations omitted).

The basic issue before the court on a motion for summary judgment is

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law."

See Anderson, 477 U.S. at 251-252.  The moving party bears the burden of proving

that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d

1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." Vega v. Invsco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

"[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B. Objection to Evidence of Non-Prosecution**

Plaintiff objects to any evidence relating to the criminal investigation, arrest and nolle prose of charges regarding the Plaintiff. In support of her contention she cites case law that holds that evidence of non-prosecution is inadmissible in a civil action. See e.g. FIGA v. R.V.M.P. Corp., 874 F.2d 1528, 1531 (11th Cir. 1989); Aetna Casualty & Surety Co. v. Gosdin, 803 F.2d 1153 (11th Cir. 1986); Williams v. Cambridge Mutual Fire Ins. Co., 230 F.2d 293 (5th Cir.1956). Such evidence is inadmissible because "the different standards of proof between a criminal prosecutorial decision and a civil case might mislead the jury." Gosdin, 803 F.2d at 1160. Even "a jury verdict of not guilty on a criminal charge is not admissible evidence in a later civil action brought by a private individual against the same defendant, for damages arising out of the same incident." Williams, 230 F.2d at 294 (citation omitted). The fact that a person was not convicted of arson does not conclusively determine that the accused did not commit arson and is irrelevant to the question. Id. As the Fourth Circuit has explained:

The reasons for this rule are easy to appreciate. First, such evidence

goes directly to the principal issue before the jury and is highly prejudicial. Second, a prosecutor's decision not to prosecute and a jury's decision to acquit in a criminal trial are based on different criteria than apply in a civil proceeding. In particular, a prosecutor's decision to nolle prosse may take into account many factors irrelevant in a civil suit, such as the higher standard of proof required for criminal conviction. In any event, a prosecutor's opinion whether the insured started the fire is inadmissible since based on knowledge outside his personal experience.

Rabon v. Great Southwest Fire Ins. Co. 818 F.2d 306, 309 (4th Cir. 1987).  However, these cases do not hold that the exclusion extends to evidence obtained during or pursuant to a criminal investigation.  Even evidence obtained by a criminal law enforcement officer pursuant to a warrant later found to be technically defective may be admitted in a subsequent civil proceeding. See e.g. United States v. Janis, 428 U.S. 433 (1976).  Evidence developed during a criminal fire investigation is relevant, but whether that evidence might have supported a criminal prosecution is irrelevant. Rabon, 818 F.2d at 309-310.

Moreover, in the instant motion, Auto-Owners is not attempting to use information of Plaintiff's indictment and prosecution in defense of Plaintiff's breach of contract claim, but to show that it did not deny Plaintiff's insurance claim in bad faith.  Courts have held that the fact that an insured had been indicted for arson can be strong evidence that the insurance company had a reasonable justification for denial. See e.g. Rose v. Hartford Underwriters Ins. Co., 203 F.3d 417, 422 (6th Cir. 2000) ("If an insured is indicted before an insurance company refuses to honor its policy, by contrast, then an indictment on arson charges certainly would be strong evidence that shows that the insurance company had a reasonable

justification for the denial of a fire insurance claim, assuming that the insurance company knew about the indictment at the time it refused to honor the claim."). The Supreme Court of Alabama has held that in a bad faith case, a Fire Marshall may testify whether the insureds were suspects in a criminal investigation of arson. United Services Auto. Ass'n v. Wade, 544 So.2d 906, 908 (Ala. 1989) ("Although a prosecutor may consider the higher burden of proof in determining whether to bring charges, an investigator obviously does not consider burdens of proof in determining whether or not he suspects someone of arson."). The Wade Court found that it would be very relevant whether the insurer knew that the investigator from the Fire Marshall's office did not suspect the insureds of arson. Id. Thus, in this case, the fact that Plaintiff was suspected of and was criminally investigated for arson by the authorities is relevant to Plaintiff's bad faith claim to the extent that Auto-Owners had knowledge of the investigation when it denied the claim.

## C. Negligence and/or Wantonness Claim

Auto-Owners asserts that Count One of the complaint should be dismissed because it asserts a negligence and/or wantonness claim and claims for negligent and/or wanton handling of insurance claims are not recognized in Alabama. Auto-Owners is correct that the Supreme Court of Alabama "has consistently refused to recognize a cause of action for the negligent handling of insurance claims, and it will not recognize a cause of action for alleged wanton handling of insurance claims." Kervin v. Southern Guar. Ins. Co., 667 So.2d 704, 706 (Ala. 1995) (citing Pate v. Rollison Logging Equipment, Inc., 628 So.2d 337 (Ala.1993); Armstrong v.

Life Insurance Co. of Virginia, 454 So.2d 1377, 1380 (Ala.1984), overruled on other grounds, Hickox v. Stover, 551 So.2d 259, 264 (Ala.1989); Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981); Calvert Fire Ins. Co. v. Green, 278 Ala. 673, 180 So.2d 269 (1965)).  Additionally, Plaintiff did not contest summary judgment as to Count One.  Accordingly, the court finds that summary judgment is due to be granted in favor of Auto-Owners as to Count One.

## D. Bad Faith Claim

Count Three of Plaintiff's complaint asserts a claim for bad faith denial of her claim for damage to her property caused by fire. (Doc. 1-1, pp. 20-21).  The tort of bad-faith refusal to pay a claim requires evidence to prove the following elements:

> (a) a breach of insurance contract, (b) the refusal to pay claim, (c) the absence of arguable reason, (d) the insurer's knowledge of such absence—with a conditional fifth element: "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."

EMCASCO Ins. Co. v. Knight, 2014 WL 5020044, *15 (N.D. Ala. Oct. 7, 2014) (quoting National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982)). "The plaintiff asserting a bad-faith claim bears a heavy burden." Shelter Mut. Ins. Co. v. Barton, 822 So.2d 1149, 1154 (Ala. 2001) (citing LeFevre v. Westberry, 590 So.2d 154, 159 (Ala. 1991)).  A "plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute." Bowen, 417 So.2d at 183.  "[A] finding of bad faith based upon rejection of an insurer's legal argument should be reserved for extreme

cases." Barton, 822 So.2d at 1154 (quoting Safeco Ins. Co. of America v. Sims, 435 So.2d 1219, 1226 (Ala. 1983) (Jones, J., concurring specially)).  "The right of an insurer to deny a claim on any arguable legal issue is to be as zealously guarded as is its right to decline benefits on any debatable issue of fact, the test of reasonableness being the same." Id. (quoting Safeco supra).  "To defeat a bad faith claim, the defendant does not have to show that its reason for denial was correct, only that it was arguable." Liberty Nat. Life Ins. Co. v. Allen, 699 So.2d 138, 143 (Ala. 1997).  "No matter how badly the insurer acted in investigating and evaluating the claim, if there was a debatable reason for refusing to pay the claim, when payment was refused, the insured was not entitled to prompt payment." State Farm Fire & Cas. Co. v. Balmer, 672 F.Supp. 1395, 1406 (M.D. Ala. 1987) (italics and citation omitted).  "[P]roof of mere negligence or mistake is not sufficient to support a claim of bad faith; there must be a refusal to pay, coupled with a conscious intent to injure." Peachtree Cas. Ins. Co., Inc. v. Sharpton, 2001 WL 286919, *5 (M.D. Ala. March 20, 2001) (citation omitted).

"Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the [insurance] claim and, thus, the legitimacy of the denial thereof, the [bad faith] tort claim must fail and should not be submitted to the jury." Nat. Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982).  To make out a prima facie case of bad faith refusal to pay, the insured must generally show that she is entitled to a directed verdict on the contract claim. Id.  Plaintiff has not moved for summary judgment on her breach of contract claim and has not

suggested here that she is entitled to judgment as a matter of law on her breach of contract claim.  Since Plaintiff has not shown that the facts demonstrate, as a matter of law, that Auto-Owners breached the contract of insurance, she cannot maintain a claim of bad faith refusal to pay.

Moreover, Auto-Owners contends that it had ample evidence to establish an arguable reason to deny the claim.  As Auto-Owners points out, there were two incendiary fires, Plaintiff had access and motive, eyewitness testimony placed her near the scene at the time of the fire, Ferrell was taped admitting to the arson and later plead guilty, and Plaintiff testified over and over again that she was with Ferrell at all times and her testimony and her cell phone records and other evidence indicate that she would have known if Ferrell had left.

> To establish an arson defense under Alabama law, an insurer must " 'prove by competent and relevant evidence arson by someone, motive by the plaintiff and unexplained surrounding circumstantial evidence implicating the plaintiff.' " Mueller v. Hartford Insurance Co., 475 So.2d 554, 557 (Ala.1985) (quoting Great Southwest Fire Insurance Co. v. Stone, 402 So.2d 899, 900 (Ala.1981)). The insurer's burden of proof is not particularly heavy. Proof may be made by circumstantial evidence "if the inferences are not too remote and all circumstances, including the inferences, are of sufficient force to bring minds of ordinary intelligence to a persuasion of incendiarism by a fair preponderance of the evidence." Id. Proof beyond a reasonable doubt, or proof by direct evidence, is not required.

Fondren v. Allstate Ins. Co., 790 F.2d 1533, 1535 (11th Cir. 1986).[1]  The facts

---

[1] Plaintiff cites case law that states that for circumstantial evidence to support the defense of arson, the evidence must be "so convincing that it will sustain no other reasonable hypothesis but that the plaintiff was responsible for the fire." (Doc. 59, p. 6, citing Mueller v. Hartford Ins. Co. of Alabama, 475 So.2d 554, 558 (Ala. 1985)). However, this standard contradicts other case law and has been found to be incorrect. See Fondren, 790 F.2d at 1535, n. 4.

presented here clearly meet the above standard.  It is undisputed that the fires were incendiary.  The Plaintiff had motive to have the house burned so that she could collect the insurance proceeds and there were circumstances implicating the Plaintiff.

Plaintiff asserts that United Services Auto. Ass'n v. Wade, 544 So.2d 906 (1989), holds that the circumstances that implicate the insured must be unexplained.  In Wade, the Court found that the circumstances in that case were not unexplained.  There was evidence that 1) Larry Wade had told others that they did not have insurance, 2) Larry Wade's ex-wife testified that he had been involved in other fires, 3) the Wade's alibi was that they had taken their young children to a late movie on a school night, 4) the Wades first drove slowly past the burning house when they arrived at the scene and 5) the Wades were the last people in the house and there were no signs of forced entry. Id. at 910-11.  However, Larry Wade testified that he only said that he "hoped" they had insurance and there was evidence that the Wades had experienced difficulties with another insurance company. Id. at 911.  There was also evidence that Mr. Wade's ex-wife harbored ill feelings toward Wade and wanted to get back at him. Id.  The Wades explained that they had just been told about the fire and were upset when they arrived at the house and wanted "to regain their composure before facing the crowd that had gathered at the scene." Id.  Additionally, the court found that the fact that the Wades were the last people in the house and that they took their children to a late movie simply did not imply that the Wades burned their own house. Id.

In the instant case, the court would agree that the fact that Plaintiff had access is certainly explainable.  However, the additional facts in this case are vastly different from the facts in Wade.  In Wade, the fire officials found no basis to suspect the Wades of arson and the insurance company knew that the Wades were not suspects.  Id. at p. 908.  The Court in Wade also found that the opinion of the insurance company's investigator that there was arson was "as a whole completely void of credibility" and "borders upon the perpetration of a fraud upon this court." Id. at 909.  In contrast, the Wade's expert carefully and professionally investigated and inspected the scene and performed a detailed, thorough and professional investigation.  Id.  The Wade Court concluded that the insurance company's investigator either "deliberately an intentionally set out to manufacture an arson case" or "his investigation was absolutely deficient, inept and inadequate." Id. Thus, in Wade, unlike the instant case, there was no reliable evidence showing that the fire was even arson.  The evidence implicating the insureds was so slight in Wade that the authorities did not even suspect the insureds of starting the fire.  As previously stated with regard to Plaintiff's objection to evidence, the fact that the Plaintiff in this case had been indicted for arson is strong evidence that the insurance company had a reasonable justification for denial.[2] Rose, 203 F.3d at 422. At the time Auto-Owners decided to deny Plaintiff's claim, it knew that Plaintiff had been charged with and was being investigated for arson.

Plaintiff also points to testimony by the claims representative, Diana Gough,

---

[2] There is no evidence of prosecutorial misconduct or that Auto-Owners participated in the decision to charge the Plaintiff.

that she did not have proof that Plaintiff had set the fire, that it was just a hunch. (Doc. 59-1, p. 4). However, there is no requirement that the insurance company have absolute proof before denying a claim, only that they have an arguable reason for denial. Moreover, Gough had never handled an arson case or any claim where the insured had been found to be at fault before and she received direction from Judson Wells and from the home office on the claim. (Doc. 59-1, p. 3; Doc. 61, pp. 17, 18). Gough testified that "they felt that there was enough – they felt there was enough outstanding evidence or coincidences in the case that they wanted to stand firm on their denial." (Doc. 59-1, p. 5). It was not Diana Gough's decision to deny the claim, it was the decision of the home office. (Doc. 59-1, p. 13; Doc. 61, p. 18). Those looking at the claim at the home office had a lot more experience. (Doc. 61, p. 20).

Plaintiff also points to testimony by Judson Wells where he admitted that there was no credible evidence that the Plaintiff herself set the fires. (Doc. 59-2, p. 15). However, Auto-Owners has never maintained that Plaintiff physically started the fires herself. Auto-Owners denied the claim because the fire was started "by or at the direction of" Plaintiff "with the intent to cause a loss" and "due to concealment or fraud." (Doc. 55-4, p. 22).

Plaintiff also contends that Auto-Owners intentionally failed to determine the existence of any legitimate or arguable reason to deny the claim. However, Auto-Owners clearly investigated the claim and had substantial investigatory evidence at its disposal to consider. As previously explained, even if the

19

investigation was lacking, if there is a debatable reason for refusing to pay the claim, the insured cannot be held liable for bad faith. Balmer, 672 F.Supp. at 1406. "[P]roof of mere negligence or mistake is not sufficient to support a claim of bad faith; there must be a refusal to pay, coupled with a conscious intent to injure." Sharpton, 2001 WL 286919 at *5 (citation omitted).

Where there is a factual dispute that centers around reasonable, but conflicting inferences that may be drawn from the evidence, "if any of the reasons for denial of coverage is at least 'arguable,' [the c]ourt need not look any further." State Farm Fire and Cas. Co. v. Balmer, 891 F.2d 874, 877 (11th Cir. 1990) (citation omitted).  Accordingly, the fact that Plaintiff later took a polygraph examination to support her contention that she was not involved in the fires did not require Auto-Owners to change its position.  Such evidence has been found to lack probative value and in this case it did not explain the circumstances, but merely added to the inconsistencies.

## CONCLUSION

For the reason explained above, the Defendant's motion for partial summary judgment (Doc. 55), is **GRANTED** and summary judgment is hereby **GRANTED** in favor of Auto-Owners Insurance Company as to Counts One and Three of Plaintiff's complaint.

**DONE** and **ORDERED** this 18th day of  May, 2015.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE